Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| **In the Matter of the Search of**<br>*(Briefly Describe the property to be searched or identify the person by name and address)*<br><br>Black iPhone with Otterbox case and charging station and a Black iPhone Model A1428 with IMEI 013424001046454, seized on October 20, 2021 from Reggie Lewis' vehicle, which are currently stored at the FBI Phoenix Office, 21711 N. 7th Street, Phoenix, AZ 85024. | Case No.<br><br>22-004 MB |

## SEARCH AND SEIZURE WARRANT

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of ____Arizona____.
(identify the person or describe the property to be searched and give its location):

### As further described in Attachment A.

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### As set forth in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before _____January 18, 2022_____.
*(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge on duty.

_____.
*(name)*

N|A

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized (*check the appropriate box*)      ☐ for 30 days (*not to exceed 30*)
☐ until, the facts justifying, the later specific date of _____.

Date and time issued: __1/4/2022 @ 1030 m__

City and State: __Phoenix, Arizona__

_____
*Judge's signature*

__Honorable Michelle H. Burns, U.S. Magistrate Judge__
*Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

## RETURN

| Case No.: | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A (1)

### Property to Be Searched

This warrant applies to the following electronic device recovered from the search of Reggie Lewis's vehicle.  The device was initially recovered by the Federal Bureau of Investigation and stored at the Phoenix Field Office of the FBI at 21711 N 7th Street, Phoenix, AZ 85024:

(1) Black iPhone with Otterbox case and charging station



### ATTACHMENT A (2)

### Property to Be Searched

This warrant applies to the following electronic device recovered from the search of Reggie Lewis's vehicle.  The device was initially recovered by the Federal Bureau of Investigation and stored at the Phoenix Field Office of the FBI at 21711 N 7th Street, Phoenix, AZ 85024:

(1)  Black iPhone Model A1428 IMEI 013424001046454



# ATTACHMENT B

All records and communications related to the violation of Title 18, United States Code §§1153 and 1111, Murder:

    a.  Telephone numbers of incoming/outgoing calls stored in the call registry;

    b.  Telephone numbers and email addresses and corresponding names to those numbers and addresses stored in the address book;

    c.  Any incoming/outgoing text messages and instant messages;

    d.  Telephone subscriber information;

    e.  Any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular telephone, including but not limited to e-mail, voicemail, and photos; and,

    f.  Global Positioning System (GPS) coordinates or any other location data stored within the device.

Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly Describe the property to be searched or identify the person by name and address)*<br><br>Black iPhone with Otterbox case and charging station and a Black iPhone Model A1428 with IMEI 013424001046454, seized on October 20, 2021 from Reggie Lewis' vehicle, which are currently stored at the FBI Phoenix Office, 21711 N. 7ᵗʰ Street, Phoenix, AZ 85024. | Case No.   22-004MB |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, SA John G. Mikel, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the District of ___Arizona___, there is now concealed (*identify the person or describe the property to be seized*):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §1111 | Murder |

The application is based on these facts:
### As set forth in Attachment C, incorporated herein by reference.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Raynette Logan *RP*
*Sworn Telephonically*

_____
*Applicant's Signature*

John G. Mikel, SA, FBI
*Applicant's printed name and title*

Date issued: __January 4, 2022__

_____
*Judge's signature*

City and State: __Phoenix, Arizona__

Hon. Michelle H. Burns, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR

## A SEARCH WARRANT

I, John G. Mikel, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

## INTRODUCTION

The facts of this case, as more fully detailed herein, are that on or about May 15, 2021 within the confines of the Gila River Indian Community ("GRIC"), within the District of Arizona, REGGIE LEWIS, SR. (hereinafter R.L.Sr.)  killed D.W., thereby violating federal law by committing 1st Degree Murder, in violation of Title 18, United States Code, §§ 1153 and 1111.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

## PRELIMINARY BACKGROUND INFORMATION

1.      Your affiant is a graduate of the FBI Academy in Quantico, VA. Your affiant has been employed with the FBI since November 2009. Your affiant is currently assigned to the FBI Phoenix Division and has primary investigative responsibility in Indian Country matters, to include, violent crimes, such as homicide, sexual assaults, and aggravated assaults.

2.      I have been trained in various aspects of law enforcement, including searching and seizing of digital media to include telephone and social media content. In addition, I have been involved in multiple investigations in which digital media, including telephones and social media accounts, have been seized, searched, and forensically examined.

1

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators and witnesses. This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of a violation of Title 18, United States Code, §§ 1153 and 1111, is located in the SUBJECT CELLULAR TELEPHONES, as described in Attachment A, for evidence of this crime as described in Attachment B.  This Court has jurisdiction over these offenses under 18 U.S.C. § 1153 because the below-described events occurred on the GRIC, a federally recognized tribe, and REGGIE LEWIS, SR. is an enrolled member of GRIC.

## DETAILS OF THE INVESTIGATION

4.    On May 15, 2021, at approximately 1625 hours, Gila River Police Department (GRPD) Sergeant Jeff Faulkner contacted GRPD Detective Jose Vargas and requested Det. Vargas respond to the area of SR 87 and Levee, Sacaton, AZ (within the exterior boundaries of the Gila River Indian Community) in reference to a 42-year-old male shooting victim. Sergeant Faulkner advised Det. Vargas that the shooting victim (identified as D.W.) had sustained a gunshot wound to the head and was pronounced deceased on scene.  Witnesses driving past the incident observed a sedan fleeing from the intersection immediately after the shooting.

5.    A witness contacted the police department and stated he/she observed a white vehicle, possibly a Dodge Charger, flee the area immediately after the shooting occurred.  An individual identified as "J.S." requested to speak with police in person.  On May 15, 2021,

2

Detective Vargas met with J.S. who said that he was driving by the area of S.R 87 and Levee Road traveling westbound when J.S. observed one female and three males standing on the side of the road near a white four-door sedan.   One male subject appeared to be arguing with another male subject.   J.S. described one of the two males arguing as flailing his arms as if he was yelling at the other male subject.   J.S then witnessed the male who appeared to be arguing extend his arm towards the other male subject.   The second male then dropped to the ground. J.S. described what happened as an "execution".   J.S then immediately searched his vehicle for his cellular phone to call the police.

     6.    On May 15, 2021, Detective K. Weeden spoke with A.S.   A.S. told Detective Weeden she witnessed three males and one female standing on the side of the road near a white four (4) door sedan.   One male then shot a second male, and the second male fell to the ground. A.S. looked through her review mirror and observed the remaining two males and single female enter the white four door sedan and depart the area west bound on Levee Road.

     7.    Detective Vargas returned to the incident location and conducted a walkthrough of the scene.   Detective Vargas approached the deceased male, D.W., from the north east walking south West toward the victim's head.   Detective Vargas observed the victim to be lying on his back with his head toward SR 87 and his feet toward Levee Road (west).   Detective Vargas observed the deceased male to have a gunshot wound to the head.   The victim was wearing a "natives with attitude" t-shirt and navy blue Dickies shorts.   The victim had on black socks and black shoes.

     8.    On May 15, 2021, Federal Bureau of Investigation (FBI) Special Agent (SA) Lisa O'Connor and Detective Vargas conducted an interview with E.A. and J.A., near the

intersection of Pear Road and Levee Road. E.A. advised he was traveling westbound on S.R 87 near Levee Road at approximately 1600 hours when he observed a white four (4) door sedan parked on the side of the road west of S.R 87, on Levee Road. E.A. observed three males and one female standing outside the vehicle on the dirt shoulder. Two of the male subjects appeared to be arguing with each other. One of the male subjects struck the other male subject in the face. The victim of the strike to the face staggered but didn't fight back. E.A. didn't know what happened next because they drove past the scene.

9.   SA O'Connor and Detective Vargas then spoke to J.A. separately from E.A., who said that he was in a vehicle traveling west bound on S.R 87 near Levee Road when he observed the white four (4) door sedan parked on the side of Levee Road. J.A observed one female and three males standing outside of the white four (4) door sedan. J.A witnessed one male subject punch another male subject. J.A. advised he didn't see anything else and could not identify who the subjects were.

10.   While speaking to J.A. and E.A., several family members of the victim arrived on scene and began asking about the identity of the decedent. Sergeant Jeffery Faulkner also arrived on scene and initially spoke to the family.

11.   During interviews with the family, Detective Vargas spoke with a female identified as D.J. D.J. advised she last saw the victim, D.W., earlier in the day while at her father's house. She identified D.W., REGGIE LEWIS, Sr., a female identified as A.J., and a male identified as R.A. D.J. said D.W., REGGIE LEWIS, Sr., A.J. and R.A. arrived at her father's in a newer white four (4) door sedan between the hours of approximately 4:00 P.M and 5:00 P.M. D.J. said she was talking to R.A. when the victim D.W. got out of the car. After D.J.

4

saw D.W., she started to talk to him for a bit.  Detective Vargas confirmed with D.J. that REGGIE LEWIS, Sr., D.W., R.A. and A.J. were all in the white four door sedan.  D.J. said yes and advised they were all standing outside the car.  D.J. explained A.J. was currently dating REGGIE LEWIS, Sr.  D.J. stated R.A. was wearing a black shirt and blue jeans, A.J. was wearing jean capris and a black shirt, REGGIE LEWIS, Sr., was wearing a dark blue shirt and black jeans, and D.W. was wearing a black shirt and black shorts.  D.J advised she only visited with REGGIE LEWIS, Sr., R.A., A.J., and D.W. for approximately ten minutes.  D.J. described the vehicle they arrived in as a white four door sedan with black rims.  D.J. advised it appeared to be a newer model and was nice looking.

12.     On May 17, 2021, Detective Vargas spoke to A.C., who stated she witnessed the shooting.  A.C. said she was traveling westbound on S.R 87 at approximately 3:20 P.M. when she observed a cream-colored four door sedan parked on the side of the road.  A.C. said the vehicle looked like a 2010 or possibly older cream-colored Cadillac CTS or a Chrysler 300. A.C. later advised the vehicle may have also been a 2010 – 2015.  The vehicle had tinted windows.  A.C. observed four subjects outside the vehicle.  A.C. identified all subjects as being Native American.  A.C. described one female as having blue colored shorts and her hair was in a "bun".  A.C. described two males as wearing all black and having shaved heads.  A.C. described the victim as wearing all black, and he also had a shaved head.  A.C. advised she witnessed the female point something at the victim, and then he fell down.  A.C. said she didn't know what happened at first, but then she noticed the victim wasn't moving and everyone else got back in the vehicle and the vehicle fled west bound.  A.C. said all four subjects were standing around at first, and then A.C. observed the female's arm extend towards

the victim.  A.C. didn't see a gun, but she saw the victim drop to the ground.  A.C. explained one male was standing near the rear driver side of the vehicle and another male was standing near passenger side.  The female was standing near the trunk area of the vehicle.  A.C. stated the female was standing approximately two to three feet away from the victim.  The female was closest to the victim, and she was standing in front of him.  A.C said the victim was standing next to a ditch back where it "curves in".  A.C. stated that she did not see any muzzle flash.  A.C. said she didn't even hear any gunfire; she only saw the victim fall.  A.C. explained she was too far away to see detail.  A.C. said she saw the "back view" of the incident. Detective Vargas asked A.C. what happened after the victim fell to the ground.  A.C. said the remaining three subjects quickly got back into the vehicle.  A.C. advised the female got into the rear passenger side door, and the vehicle sped off.   It should be noted that Det. Vargas describes REGGIE LEWIS, SR., as having a ponytail at the time of the incident.

13.    On May 19, 2021, Detective Vargas spoke with C.M. at a residence in the Sacaton area.  C.M. stated she knew D.W. as "Kooter".  C.M. advised REGGIE LEWIS, Sr., A.J., R.A., and D.W. came to the residence between the hours of 3:00 P.M. and 4:00 P.M.  C.M. identified R.A. as her boyfriend.  After C.M. came out of the house, REGGIE LEWIS, Sr., asked C.M. for a hug.  C.M. and REGGIE LEWIS, Sr., started to have a conversation about his and R.A.'s friendship.  C.M. said she didn't notice D.W. until she saw him in the back seat of the vehicle. When D.J. (C.M.'s daughter) came out, D.W. exited the vehicle and went to talk to D.J.  D.W. and D.J. had a friendly conversation, and then C.M. said hello to D.W. after she noticed him exit the car.  A.J. was talking outside the vehicle and REGGIE LEWIS, Sr., D.W., and R.A., were ready to leave.  They started joking saying they were going to leave A.J. because she was

1  taking too long.  C.M. explained there were no arguments, and everyone was getting along.

2  A.J. got into the vehicle, and all four individuals who arrived, left in the car.  C.M. advised

3  REGGIE LEWIS, Sr., A.J., R.A. and D.W. were only at the residence for approximately 15

4  minutes.  C.M. described the vehicle as a white car that belonged to REGGIE LEWIS, Sr.

5

6  C.M. said she didn't know the make or model.

7       14.    After leaving the residence, Detective Vargas received a phone call from a male

8  who identified himself as R.A.  R.A. agreed to meet with police at his workplace. Detective

9

10 Vargas and Sergeant Orlando Ramirez met with R.A.  On the day of the incident, R.A. said he

11 went to see C.M. and D.J.  D.W. got out of the vehicle and gave D.J. a hug.  R.A. was with

12 REGGIE LEWIS, Sr., D.W. and A.J.  R.A. said he was drinking with these people Friday night

13
   into Saturday.  On Friday, REGGIE LEWIS, Sr., picked up R.A., and they went into Chandler.
14

15 From Chandler, they went to REGGIE LEWIS, Sr.'s house.  After being at REGGIE LEWIS,

16 Sr.'s house, R.A. was dropped off at his house.  R.A. explained he started drinking with

17 REGGIE LEWIS, Sr., A.J. and D.W. at his house on Saturday.  R.A. went "cruising" with

18
   REGGIE LEWIS, Sr., A.J. and D.W.  R.A. asked REGGIE LEWIS, Sr., to stop by where C.M.
19

20 was at so R.A. could give C.M. money.  R.A. said he couldn't remember what happened after

21 that.

22
        15.    Initially, R.A. stated that he couldn't remember several details regarding the incident.
23

24 After discussing the seriousness of the investigation, R.A. was willing to provide more detail

25 about what he witnessed.  R.A. said they were driving around in REGGIE LEWIS, Sr.'s car.

26 R.A. described the car as a tan colored four door sedan with tinted windows.  R.A. said while

27
   REGGIE LEWIS, Sr., A.J., D.W. and he were driving in the car nobody was talking.  R.A.
28

1   described the music as being loud, and they would need to yell to communicate.  R.A. said

2   they stopped on the side of the road, and he saw REGGIE LEWIS, Sr., and D.W. get out of the

3   car.  When REGGIE LEWIS, Sr., got out of the car, he opened D.W.'s door, and they both got

4
5   out.  R.A. heard REGGIE LEWIS, Sr., tell D.W. something when they exited the car, but he

6   couldn't provide detail because of the music volume.  R.A. wasn't sure why they stopped or

7   why REGGIE LEWIS, Sr., and D.W. got out of the car.  R.A. said REGGIE LEWIS, Sr., was

8
9   sitting in the front seat passenger seat, D.W. was sitting in the back passenger seat behind the

10   front passenger, A.J. was driving, and R.A. was sitting in the back seat behind the driver.  R.A.

11   said he observed REGGIE LEWIS, Sr., and D.W. start to get in a fight.  R.A. got out of the car

12   to see what was going on.  When R.A. got out of the car he went back towards the rear of the

13
14   vehicle.   When R.A. got to the trunk area of the vehicle he looked up and saw REGGIE

15   LEWIS, Sr., and D.W. standing approximately 10 to 20 yards away from the vehicle in the dirt

16   area.  When R.A. looked up at REGGIE LEWIS, Sr., and D.W., R.A. saw REGGIE LEWIS,

17   Sr., with his arm extended at D.W.  R.A. heard a single gunshot, and D.W. immediately fell to

18
19   the ground.  REGGIE LEWIS, Sr.'s arm was still extended toward where D.W. was standing at

20   this point.

21       16.   REGGIE LEWIS, Sr., turned and appeared to be tucking in his shirt as he walked

22   back toward the vehicle, but it was his belief REGGIE LEWIS, Sr., was tucking his gun in his

23
24   waist band.  R.A. did not see REGGIE LEWIS, Sr., with the gun in his hand, but the gunshot

25   came from where REGGIE LEWIS, Sr., and D.W. were standing.  R.A. said he panicked once

26   he heard the shot and saw D.W. fall to the ground.  R.A. said no one else was standing near

27   REGGIE LEWIS, Sr., and D.W. when he heard the gunshot.  R.A. said A.J. was somewhere

28

8

near the car. R.A. said he kept saying "what the fuck" several times. REGGIE LEWIS, Sr., told him to shut up several times and to get into the car. R.A. said A.J. got into the driver seat, REGGIE LEWIS, Sr., got into the front passenger seat, and he got into the back seat. A.J. drove away, and R.A. said he told A.J. to take him home. R.A. was afraid REGGIE LEWIS, Sr., would hurt him next. R.A. advised REGGIE LEWIS, Sr., told A.J. to take him home. A.J. was screaming and/or crying while she was driving. REGGIE LEWIS, Sr., just kept saying to shut up. A.J. took R.A. home, and REGGIE LEWIS, Sr., and A.J. drove off.

17. R.A. said he hasn't heard from REGGIE LEWIS, Sr., since the incident. R.A. didn't know why REGGIE LEWIS, Sr., shot D.W., and R.A. didn't know of any problems. R.A. said he has only heard from REGGIE LEWIS, Sr., via text since the shooting happened. R.A. said REGGIE LEWIS, Sr., told him he was on vacation and told R.A. what to do at work. R.A. advised REGGIE LEWIS, Sr., never talked about what happened. R.A. provided Detective Vargas with REGGIE LEWIS, Sr.'s, cellular phone number. The cellular phone number provided by R.A. for REGGIE LEWIS, Sr., was 520-371-3822.

18. On May 25, 2021, Detective Vargas spoke with a female via cellular phone who identified herself as M.V. M.V. stated she was A.J.'s sister. M.V. advised A.J. quit her job around the day of the shooting. M.V. wasn't sure exactly when A.J. quit her job, but she did know A.J. told her employer it was for personal reasons. M.V. said on May 24, 2021, she sent text messages to A.J.'s cellular phone. A.J. would only tell M.V. that she was on vacation with REGGIE LEWIS, Sr., and she didn't know when she would be back. A.J. wouldn't answer her phone and would only send text messages. A.J. wouldn't tell M.V. or any other family where she was located.

19.    Through a check of Motor Vehicle Division (MVD) registration, it was determined that REGGIE LEWIS, Sr., was the registered owner of a 2014 white Cadillac ATS four (4) door sedan, bearing Arizona (AZ) License Plate CJM6679.   As a result, the following AZ License Plate was entered into license plate recognition systems by an Arizona High Intensity Drug Trafficking Areas (AZ HIDTA) analyst.   Detective Vargas received the results, which identified the aforementioned vehicle traveling northbound on AZ Kingman US-93 Highway on May 16, 2021.  The following screenshot was provided:

### Sighting Detail Information



Plate : CJM6679                          Plate State : Arizona
Location : DEA FCU AZ Kingman US-93      Highway Name : DMS379 US-93 S Northbound
Time : 2021-05-16 15:02:02 MST           Direction : Northbound
Reader ID : Elsag 1074                   Coordinate : 35.19962,-114.07893



20.    On May 20, 2021, AZ HIDTA analyst C. Chaney confirmed that REGGIE LEWIS, Sr., is associated with the phone number (520)371-3822.   R.A. was also able to provide this same phone number to Det. Vargas during his interview.

21.     On June 16, 2021, a tracking warrant and Pen Register / Trap and Trace for this phone number was signed and subsequently served to Verizon.  Verizon responded via email on June 17, 2021, stating that the order could not be served as the phone number was changed on 5/25/2021.  Included in that email was subscriber information indicating that REGGIE LEWIS SR was the owner of account number 225870654-1.

22.     The GRIC law office determined there was probable cause for a Felony Arrest Warrant for the charge of Homicide against REGGIE LEWIS SR.  This warrant and a "be on the lookout" (BOLO) notification for the vehicle described above were placed into the systems for the National Crime Information Center (NCIC) and Arizona Crime Information Center (ACIC) in June of 2021.

23.     On August 26, 2021, the vehicle was located by El Dorado County Sheriff's Deputies.  After a pursuit from California into Nevada, REGGIE LEWIS, SR. was taken into custody and his vehicle impounded.  LEWIS and the vehicle were transported back to the Phoenix area on September 22, 2021.  The vehicle was impounded in the FBI Field Office Parking Area.

24.     On October 20, 2021, members of the FBI Evidence Response Team (ERT) conducted a search of the vehicle as authorized by a Federal Search Warrant signed in the District of Arizona.  During this search, ERT members located two cellphones, identified as a Black iPhone with Otterbox case and charging station, as described in Attachment A(1), and a Black iPhone Model A1428 with IMEI 013424001046454, as described in Attachment A(2) (SUBJECT CELLULAR TELEPHONES).

25.     The SUBJECT CELLULAR TELEPHONES are currently in the lawful possession of the FBI. They came into the FBI's possession in the following way: taken during a search warrant execution on REGGIE LEWIS'S vehicle.   Therefore, while the FBI might already have all necessary authority to examine the SUBJECT CELLULAR TELEPHONE, I seek this additional warrant out of an abundance of caution to be certain that an examination of the SUBJECT CELLULAR TELEPHONES will comply with the Fourth Amendment and other applicable laws.

26.     The SUBJECT CELLULAR TELEPHONES are currently in storage in the Evidence Control Room at 21711 N. 7th Street, Phoenix, Arizona 85024. In my training and experience, I know that the SUBJECT CELLULAR TELEPHONES have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT CELLULAR TELEPHONES first came into the possession of the FBI.

### TECHNICAL BACKGROUND

27.     Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found in the contents of the SUBJECT CELLULAR TELEPHONES.

28.     In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the SUBJECT CELLULAR TELEPHONES.

## DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE

29.     As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the SUBJECT CELLULAR TELEPHONES.  Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

30.     *Probable cause.*  Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the SUBJECT CELLULAR TELEPHONE for at least the following reasons:

a.     Your Affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime.  The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The cellular telephone is also likely to be a storage medium for evidence of crime.  From my training and experience, your Affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.     Based on my knowledge, training, and experience, your Affiant knows that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone

13

numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c.     Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

d.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

31. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable

cause to believe that this forensic electronic evidence will be found in the contents of the SUBJECT CELLULAR TELEPHONES because:

a.     Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or exculpating the owner.  Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used.  For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet.  Such information allows investigators to understand the chronological context of cellular telephone

15

access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may either inculpate or exculpate the user of the cellular telephone. Last, information stored within a cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.     A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the

application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

32.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise copying the contents of the SUBJECT CELLULAR TELEPHONE, including the use of computer-assisted scans.

33.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34.  Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts as set forth in this affidavit, there is sufficient probable cause to believe a violation of Title 18, U.S.C., § 1111, Murder, has been committed, and evidence of the crime will be found in the SUBJECT CELLULAR TELEPHONES described in this Affidavit and Attachment A. I believe that names, nicknames, and/or telephone numbers of other subjects involved in, and associated with the murder, as well as

data describing the time, date, the duration of incoming and outgoing calls to the cellular phone, incoming and outgoing text messages, and other electronic data as listed in Attachment B, will be located in SUBJECT CELLULAR TELEPHONES. Wherefore, your affiant respectfully requests a warrant be issued authorizing Special Agents to examine, analyze, and make record of the contents of the information stored in the seized cellular telephones described in this Affidavit and Attachment A, which is presently in the custody of the FBI. This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Jan 3, 2022

Special Agent John G. Mikel
Federal Bureau of Investigation

Subscribed and sworn to before me this _4_ day of January, 2022.

U.S. Magistrate Judge Michelle H. Burns
District of Arizona

18